## IN RE IMPROVEMENT OF THIRD STREET, ST. PAUL. REALTY INVESTMENT & SECURITIES CORPORATION AND OTHERS, APPELLANTS.[1]

January 15, 1932.

No. 28,513.

*T. C. Fitzpatrick, Paul G. Bremer, F. W. Foote, O'Brien, Horn & Stringer, Lightner & Gehan, W. W. Cutler, George W. Markham, William F. Hunt, Calvin Hunt, R. A. Walsh,* and *Harry Weiss,* for appellants.

*Lewis L. Anderson* and *Louis P. Sheahan,* for respondent.

[1]Reported in 240 N. W. 355.

STONE, J.

Appeal by numerous property owners from a judgment confirming the assessment of benefits for the so-called Third street project, a local improvement in St. Paul.

The loop or downtown business district of St. Paul fronts along its southern side on the scenic, cliff-bound, primary valley of the Mississippi river. Third street lies within a block of the bluff's edge. Formerly it was the main business street of the city. Years ago trade began moving northward away from it onto its parallel rivals, Fourth, Fifth, Sixth, and Seventh streets. Its condition when this improvement was started was depressed and, in comparison with its former importance, ignominious. The buildings on both its sides were old, many of them relics of the early days of Minnesota statehood. Not a few were vacant and due for early condemnation. Some had been wrecked, and the vacant lots become eyesores or, at best, parking areas. This thoroughfare, atop the cliff overlooking the Mississippi, was potentially a municipal asset. But it had been neglected so much and so long that, to summarize much of the testimony for the city, it had become almost a municipal liability, a "blight" on itself and the whole loop district.

The improvement of Third street, now involved, reaches from Sibley street on the east to St. Peter on the west, both streets running north from Third. Between, in order from the east, are Jackson, Robert, Minnesota, Cedar, and Wabasha streets. For these six blocks, all the buildings on the south side of Third street, with an exception not now important, were to be and have been wrecked and the land condemned. For the narrow, run-down street of territorial days, 52 feet wide, shut away from the magnificent view over the river, there has been substituted a modern avenue with two roadways, each 38 feet wide, and a broad mall between. The vista across to the timbered bluffs on the south side of the Mississippi and east and west, up and down the deep valley for miles, is without obstruction.

The cost, upwards of $2,000,000, has been borne in large part by the county of Ramsey, in which St. Paul is situated. The city's portion, $564,289, has been assessed to property in the loop district.

Its east and west limits are not now important. The assessed area extends four and one-half blocks north to a line midway between Seventh and Eighth streets. The assessments are graduated downward in proportion to distance north from Third street and east and west from the ends of the improvement. Subject to that factor, they were spread, and each lot was assessed under what is called the Seamer rule, named for its author, Mr. Leonard C. Seamer, chief of the bureau of assessments of the department of finance of the city of St. Paul.

But one improvement is involved. The technical matter of titles of ordinances and resolutions put aside, it was held below, and is plain, that the city council all along has considered the improvement as a unit. If it was, the argument for appellants fails in so far as it challenges the jurisdiction of the city council. That argument is that the proceeding was not one but two; and, while there was jurisdiction for the first, looking to the condemnation of the necessary land, there was none for the second, which, roughly speaking, contemplated the completion of the job. Our affirmance of the holding below that there was but one proceeding disposes of the point adversely to appellants. We need not go into details.

■ Nor need we say much of the existence and amount of benefits in gross. To us they seem obvious. But that does not matter. The important thing is that such was the view of the city council and the decision below, with abundance of evidence in support. There are many and well informed observers who wonder why an improvement so obviously needed and altogether beneficial for the whole city was not undertaken years ago. The evidence well supports the decision of both council and court on this point. Anyway, the legislative judgment of the council prevails, unless on the evidence it is demonstrably wrong. Hughes v. Farnsworth, 137 Minn. 295, 163 N. W. 525; In re Concord Street, 148 Minn. 329, 181 N. W. 859. Here there may be good ground for the opinion that it is demonstrably right. The improvement is designed in part so to rearrange downtown St. Paul as to meet the "traffic problem" arising from our motorized age. The solution of such problems is

not the task of judges, and they will be slow to disturb the work of those in legislative and executive place whose job it is.

■ The difficult question comes from the manner in which the benefits have been spread. Much testimony and argument to the contrary notwithstanding, the Seamer rule ignores, and properly, both use and present value. That is, a vacant lot takes the same load as if occupied by a modern skyscraper. Conversely, one carrying a 30-story new office building is assessed no more than if vacant. The rule is in fact a mere table of irrefragable and graduated percentages showing how any predetermined assessment per front foot, taking as 100 per centum the normal depth of 150 feet, applies to lots of lesser depths from 149 feet down to 10. The assessment per front foot predetermined, the rule does the rest, regardless of both use and value, present or prospective. "Between the graduated rates," testified Mr. Seamer himself, "every piece of property in this district" was so "assessed according" to the rule. The rule "enunciated," and the graduated rate per front foot predetermined, an assistant did the rest, carried out the figures, made the "extensions" for each lot.

The rule assumes to assess on the basis of frontage. That however is but one of its two major bases, depth being the other. Corner location is the third and minor factor. Corner lots, 50 feet or less in width, are charged 10 per centum additional for the benefit of location. Taking the normal depth of 150 feet as 100 per cent, the assessments for shallower lots are arbitrarily determined by graduated percentages ranging from 99.8 for 149 feet to 40 per centum for 10 feet of depth. A lot 102 feet deep, 6 inches short of three-fourths of the normal 150, takes an assessment of 90.4 per centum. A lot of half the basic depth, or 75 feet, is assessed 83.5 per centum of the normal. One 37 feet deep, 6 inches short of one-fourth of the normal, takes 69 per centum of the full assessment for 150 feet of depth.

It is thus plain that the rule is not really a front foot rule. It is rather an area rule; for in result, and that is what counts, it assesses for area rather than frontage. As such it must stand or

fall. The front foot rule is not considered an appropriate standard for assessing benefits on property not abutting directly on the improvement. Anno. 28 L.R.A. (N.S.) 1124, 1192.

Indefensible inequalities unavoidably result from the peculiar effect of the rule on corner lots. One, of the normal dimensions of 50 x 150 and facing an east and west street, as nearly all do, gets a normal assessment, based on its shorter or 50-foot frontage. Its longer 150-foot frontage on the side street is ignored, except for a 10 per centum addition for corner advantage. At a front foot rate of $10, the total would be $550. But let such a lot be divided as to ownership transversely, and the assessment goes rapidly upward regardless of the absence of excess benefit in comparison with the undivided lot. If a corner lot be divided by a line parallel with and 25 feet from its short front, A owning the resulting front tract, 50 x 25, and B the rear, 50 x 125, here is what happens. A's front lot is assessed on the basis of its 50-foot frontage. Its depth being 25 feet, the assessment, exclusive of the 10 per centum addition for corner location, is 60.4 per centum of what it would be for the normal depth of 150 feet. At a front foot rate of $10, the total, inclusive of that for "corner influence," would be $332.20. B's rear lot is then assessed on the basis of its entire frontage of 125 feet on the side street, and its depth of 50 feet, which compels it to take 77 per centum of the normal for a depth 150 feet. With the same assumed levy of $10 per front foot, the resulting assessment would reach $962.50. The total for the divided lot would be ($332.20 plus $962.50) $1,294.70, whereas the undivided lot of the same area gets only $550. In this way transverse divisions of a given corner area are the sole factor seized upon to justify substantial increases. The increase will be larger or smaller in proportion as the transverse division is moved forward or backward. The shallower the lot, the greater relatively becomes the percentage it must take.

There is certainly no reason why the owner of an entire 150-foot corner lot, solely because he owns all of it, should be assessed less for the rear 125 feet than the owner of the corresponding 125 feet across the street, or any other frontage in the same relation. Nor is there reason why the owner of the latter, simply because he is not

fortunate enough to own more, should bear an assessment much larger than that on the opposite frontage across the street, or any other similarly situated in respect to benefits. The rule systematically effects just that sort of discrimination against the smaller, and in favor of the larger, tract wherever divisions of ownership, and there are many of them, furnish the opportunity. Here are some illustrations from the record.

Facing each other across Minnesota street, on the south side of Sixth, are two tracts equidistant from improved Third street and obviously benefited alike. The one to the west, at the southwest corner, has a frontage on Sixth of 100 and on Minnesota of 150 feet. The other tract, east of Minnesota, has a frontage on Sixth of only 80 feet, and the same depth as the other, 150 feet. The Seamer rule assesses the larger, west of Minnesota, $641.74; whereas the load put upon the smaller, east of Minnesota, is $972.09. The smaller tract takes an assessment $330.35 greater than the larger.

The explanation is that the westerly tract consists of two lots, 50 x 150 feet, in the same ownership, and fronting Sixth street. The easterly tract, on the other hand, consists of three lots, each with a 50-foot frontage on Minnesota and a depth of 80 feet, this depth for the northerly lot being frontage on Sixth. This latter lot is assessed as a corner lot and on the basis of its Sixth street frontage, whereas the other two are assessed on the basis of their Minnesota street frontage. Comparing the assessment for the 50 x 80 lot at the northeast corner, its area 4,000 square feet and total frontage on both streets 130 feet, with that on the 50 x 150 lot on the northwest corner, its area 7,500 square feet and its total frontage on the two streets 200 feet, we find the smaller lot taking an assessment of $366.71 and the larger $336.15.

Another example is found in two tracts facing each other across Fifth street where it intersects the east side of St. Peter. These lots happen to be of the normal 50-foot frontage and 150-foot depth. The one to the south, nearer the improvement, gets a levy of only $560.25, whereas the one to the north is hit for $749.84, or $189.59 more than its more fortunate neighbor across the street. The larger assessment on the more remote tract comes about again be-

cause of an imaginary line crossing the lot 50 feet from its northern boundary, the northerly 50 feet being ·in one ownership and the southerly 100 in another.

Two illustrative properties face each other across Cedar street where it intersects the south line of Fourth. The property to the west, occupied in part by the old Globe building, consists of four lots 85 feet in depth and all facing Cedar street, the northerly two having a frontage of 50 feet each, and the southerly two 25 feet each, the corner lot on the north having its 85 feet of frontage on Fourth street. These four lots, with a total area of 12,750 square feet, are assessed $4,169.73. The similarly situated property across Cedar, consisting of two normal lots, each fronting 50 feet on Fourth with a depth of 150 feet and an area of 15,000 square feet, are assessed only $1,739.82. Area for area, they are equally benefited by the improvement, which is but half a block to the south. Yet the smaller tract on the west is assessed $2,429.91 more than the larger tract on the east, by reason alone of the imaginary lines which divide it and mark the boundaries between the respective ownerships.

That same factor, differences in platting and ownership, explains why the north halves of the two blocks we are now considering, block 23 (west) and block 24 (east of Cedar street), are assessed for widely different totals. The two half-blocks are alike in all respects, except that block 23 has a frontage of 335 feet on Fourth, whereas block 24 has only 300 feet. The total assessments for the north half of block 23 are $10,989.57, whereas the total for the north half of 24 are $5,133.29. Except for the slight contribution of the additional 35 feet in the north half of 23, the discrepancy of $5,856.26 comes only from the peculiar application of the Seamer rule to the smaller and shallower lots facing north and south streets in comparison with the longer and normal lots facing east and west streets.

A further comparison of assessments on similarly situated properties in blocks 23 and 24 shows intolerable discriminations. The same assessments are put on all the normal, inside, Fourth street fronting lots, each taking a levy of $850. The corners of the two

blocks facing each other across Cedar street are assessed as already shown. A greater disparity is displayed by the assessments on the northwest corners. At each are two normal lots, 50 x 150. The pair at the northwest corner of block 24 front 100 feet on Fourth street and 150 on Cedar. The pair at the northwest corner of block 23 front 100 feet on Fourth and 150 on Wabasha. Wabasha street property was not considered to have been benefited any more than that on Cedar. The two corner areas are equal and equidistant from Third street. Yet the northwest corner of block 24 is assessed $1,739.82, while the corresponding and equal area of block 23 is loaded to the extent of $4,269.84, the difference being $2,530.02, or nearly 250 per centum. The difference comes about solely because the two normal lots at the northwest corner of block 24 are in one ownership, whereas the two at the northwest corner of 23 are divided, the northerly 65 feet belonging to one, and the southerly 85 feet to a different owner. Because of that alone, no other factor having anything to do with the result, the northerly 65 feet on the basis of its Fourth street frontage is assessed $1,433, and the southerly 85 feet on the basis of its Wabasha street facing gets $2,836.84. The similarly located property at the northwest corner of block 24 is free from any such differential, although it has precisely the same advantage. That is, its southerly 85 feet front Cedar precisely the same as the southerly 85 feet of the two lots at the northwest corner of block 23 face Wabasha, and the two are equidistant from Third street.

There is certainly something wrong with any rule that brings about such results. We need not multiply illustrations. We have gone far enough to show how small tracts, facing side streets, are discriminated against as compared with similarly located and benefited ground (in many cases it is directly across the street) where there is not the slightest justification for imposing a larger assessment on one than on the other. In gross, the result is a wholly indefensible discrimination against the small tracts in favor of the larger ones.

■ The applicable legal mandate is not in doubt. Given legislative authority, municipal corporations may "levy and collect as-

sessments for local improvements upon property benefited thereby without regard to a cash valuation," but they must "be uniform upon the same class of subjects." Minn. Const. art. 9, § 1. So, in the exercise of its legislative power, the city council of St. Paul "may apportion special assessments according to any method it deems proper, subject only to the requirement that such assessments be uniform upon the same class of property, that they be confined to property specially benefited by the improvement, and that they do not exceed such special benefits." State ex rel. Oliver I. Min. Co. v. City of Ely, 129 Minn. 40, 47, 151 N. W. 545, 547, Ann. Cas. 1916B, 189. It is that requirement of uniformity that is violated so plainly and frequently by the Seamer rule. So, even under § 247 of the charter of the city of St. Paul, it is a case where the assessment should be set aside because "made upon a demonstrable mistake of fact, or upon an illegal or erroneous principle of law."

As applied to assessments for local improvements, the requirement of uniformity is about the equivalent of the former one of equality which existed before our constitution was amended to give municipal corporations the power they now have. (See note, 28 L.R.A.(N.S.) 1136–1137.) The uniformity demanded is not the mathematical rectitude of equation or proportion. Noonan v. City of Stillwater, 33 Minn. 198, 203, 22 N. W. 444, 446, 53 Am. R. 23. There it was said to be enough to satisfy the demand for equality in taxes that a rule be "one which will generally, and unless with accidental exceptions, apportion the burden justly, or with such approximate justice as is usually attainable in tax cases." As was said in another case, the cost of a public improvement "must be apportioned, according to some reasonable rule, upon the basis of benefits, ascertained or implied, resulting to the property assessed." State ex rel. Stateler v. Reis, 38 Minn. 371, 374, 38 N. W. 97, 98. For other Minnesota cases, see 4 Dunnell, Minn. Dig. (2 ed. & Supp.) § 6850, et seq. For collection and review of the cases involving the front foot rule, see notes, 28 L.R.A.(N.S.) 1125; L. R. A. 1917D, 372; 56 A. L. R. 941.

We see no valid objection to the manner of graduating benefits from Third street north, the assessments decreasing inversely to

distance from the improvement. That is the sort of question upon which the legislative judgment of the council is final. Doubtless the spreading of the assessments on an area basis, distance from the improvement being considered in graduating them downward, is the only method that can be followed. There is no impropriety in increasing the levy on corner lots in proportion to the increased benefit which in the legislative judgment of the council they receive. But certainly there is nothing to justify the use of an area standard, or any other, in such fashion as to bring about gross inequalities of the kind this case exhibits. It has never been thought, where two tracts are alike in every respect relevant to the improvement, that the two or three or more owners of one must, in consequence of the division of ownership and for no other reason, together bear an assessment grossly in excess of that of the single owner of the other. That is precisely the kind of inequality and artificial discrimination prohibited by the constitutional demand for uniformity in taxation. "An assessment of this kind is a tax, the levying of which is an exercise of the taxing power." State ex rel. Oakland Cemetery Assn. v. City of St. Paul, 36 Minn. 529, 530, 32 N. W. 781.

We make no pretense of having considered on its own merits each of the numerous appeals before us. All "the assessments under review were made pursuant to a deliberately adopted system. The case is not one of mere errors in judgment in following a proper method, * * * but one where the challenged discrimination resulted from a plan of assessment which was none the less systematic and intentional because of belief in its validity." Cumberland Coal Co. v. Bd. of Rev. of Tax Assessments, — U. S. —, 52 S. Ct. 48, 76 L. ed. 131.

For the reasons stated and to the extent indicated, we find the plan unsound and must reverse the judgment confirming the resulting assessments. The result, we anticipate, must be such a general reassessment as to make futile any further examination of the assessments as they stand.

Judgment reversed.